UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN L. SLATER,

    Plaintiff,

v.

                          File No. 1:13-CV-467

                          HON. ROBERT HOLMES BELL

CONSUMERS ENERGY,
MIKE MCCULLEY, and
RICHARD SCOTT,

    Defendants.
                                     /

## **O P I N I O N**

      This matter is before the Court on Defendants Consumers Energy, Mike McCulley, and Richard Scott's motion for summary judgment against Plaintiff Karen L. Slater. (ECF No. 45.) On April 30, 2013, Slater brought suit against her former employer, Consumers Energy, and her former supervisors, Mike McCulley and Richard Scott, alleging discrimination under federal statutes: Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, Family and Medical Leave Act, and Michigan state laws: Persons with Disabilities Civil Rights Act, Elliott-Larsen Civil Rights Act, and tortious interference in business expectancies. On June 4, 2014, the parties stipulated to dismiss the Title VII, Elliott-Larsen Civil Rights Act, and tortious interference claims. For the reasons that follow, Defendants' motion for summary judgment will be granted as to all remaining claims.

### I. Factual Background

      Plaintiff Karen Slater began working for Consumers Energy as a meter reader in Flint, Michigan over twenty years ago. (First Amd. Compl. ¶ 17, ECF No. 4.) In 2009, Slater was promoted

to a management position, Employee Development Consultant, and relocated to Marshall, Michigan. (*Id.* ¶ 18; ECF No. 49, Ex. A at 65.) Her responsibilities included teaching classes on topics such as breakers, switches, grounding, and substation maintenance. (*Id.* ¶ 65.)

She was assigned the "Step II project" almost immediately upon starting her position, which required her to develop new training modules, PowerPoints, and instructional plans focused on ensuring new employees know proper safety techniques. (First Amd. Compl. ¶ 25.) Consumers engaged in a task analysis process to identify all the tasks and deadlines associated with the Step II project. (Decl. of Jack Gordier ¶ 5, ECF No. 46, Ex. 3.) Subject matter experts were to assure Slater understood the substance of the material that formed the Step II curriculum. (*Id.*)

From an early date, Slater demonstrated lackluster progress on the assignment. In her 2010 performance review, she did not meet expected results to revise the curriculum to match business needs. (ECF No. 46, Ex. 9.) She was tasked with continuing to assemble and develop the Step II program in 2011. (*Id.*) Her supervisor Jack Gordier testifies that Slater's 2010 performance review contained the worst marks he recalled ever making at Consumers. (Decl. of Jack Gordier ¶ 4, ECF No. 46, Ex. 3.)

In July 2010, Slater injured her hamstring while playing softball. (First Amd. Compl. ¶ 21.) She required surgery to reconnect the muscle to her bone, and she received 112 days of paid leave for her surgery and recuperation. (*Id.*) She returned to work in November 2010 and resumed her former position. (*Id.* ¶ 27.)

On March 22, 2011, Slater met with Jack Gordier, subject matter expert Jason Humphrey, and Kathleen Zelsneck to discuss the Step II project and deadlines. (*Id.* ¶ 36-37.) Around that same time, Slater discovered that she required a second surgery to repair her hamstring. (*Id.* ¶ 38.) On

March 23, 2011, she informed her immediate supervisor Jack Gordier that she required another six months to one year of leave from work for her second surgery and recuperation. (*Id.* ¶ 38-39.) Slater went on paid leave for her second surgery on April 20, 2011 and did not resume work until October 2011. (*Id.* ¶ 45.)

In October 2011, Slater began working from home on the medical authorization of her treating physician Dr. Noud. (*Id.* ¶ 51.) At some time after October 2011, Consumers assigned Slater a coach, Jason Humphrey, to assist her in the Step II project because, in her words, "I brought it up several times that, you know, I was basically lost as to what I should do." (Slater Dep. 118: 4-10, ECF No. 49, Ex. A.)

On January 25, 2012, Slater returned to full-time work at the Consumers facility. (*Id.* ¶ 56.) Just prior to her return, Consumers requested that Slater receive an independent medical exam (IME) on January 16, 2012, from Dr. Holda to assess whether she required any work restrictions. (*Id.* ¶ 52-53, 57.) Dr. Holda recommended that Slater could return to work with restrictions from prolonged standing, walking, or climbing for three months. (*Id.* ¶ 53.) On January 27, 2012, Slater met with Consumers' athletic trainer, Jim Fast, to evaluate her work space and provide an ergonomic assessment. (*Id.* ¶ 73.) The athletic trainer recommended that Slater move and stretch throughout the day and that Consumers provide her with a high-low desk, which adjusts to allow the user to sit or stand at her workstation. (*Id.* ¶ 74.)

Upon her return to work, Slater's only assignment was the Step II project. (*Id.* ¶ 66.) In March, she received a negative performance appraisal for the 2011 calendar year because she was unable to perform her job and she did not have the knowledge necessary for her duties. (*Id.* ¶ 85.)

Defendants Scott and McCulley evaluated Slater for her annual raise and suggested a 1% increase. (*Id.* ¶ 95.)

On April 23, 2012, Slater was placed on a Performance Correction Plan (PCP), which cited her inability to progress in the Step II project and her frequent breaks. (*Id.* ¶ 96-97.) Consumers admonished Slater for taking five or six 20-minute smoke breaks every day. (Decl. of Richard Scott, ¶ 7, ECF No. 46, Ex. 5.) As to the Step II project, Slater had accomplished less than 1% of the project, by her own accounting, from the time it was assigned to her in 2009 until she began working from home in October 2011. (Slater Dep. 149: 22-25, ECF No. 49, Ex. A.) She had completed 15% of the project by February 2012 and 50% by late April. (Slater Dep. 213, 242.) Consumers expressed dissatisfaction with Slater's efforts on the Step II project, which should have required 200–400 hours to complete. (Decl. of Jack Gordier ¶ 4, ECF No. 46, Ex. 3.)

On April 26, 2012, Slater complained to Consumers' Compliance Department that she was being harassed and retaliated against by her supervisors due to her disability and request for accommodations. The Compliance Department briefly investigated and told her she had a performance issue, not a harassment issue. (First Amd. Compl. ¶ 102.)

On April 30, 2012, Slater had a meeting with Human Resources Representative Lisa Garrett, Defendant Scott, and Defendant McCulley. At this time, Garrett presented the terms of the PCP, including a June 22 deadline for the Step II project. Garrett also offered Slater an early retirement package. Slater initially accepted the package, then withdrew her acceptance. (*Id.* ¶ 104.)

Sometime in May 2012, Slater provided additional documentation from her treating physician Dr. Noud regarding her need for possibly permanent disability restrictions, consisting of lifting, pushing, or pulling twenty pounds; sitting for twenty minutes or two hours per shift; walking or

4

standing twenty minutes per hour per eight-to-fifteen hour shift; limited driving; and no climbing on ladders. (*Id.* ¶ 109.) On June 1, 2012, Consumers' IME physician, Dr. Holda, wrote that he concurred with Dr. Noud's restrictions of no prolonged sitting and an adjustable high-low workstation. He later amended his opinion to conclude that Slater did not require any restrictions in light of her sedentary job description. (ECF No. 46, Ex. 15.) To accommodate Slater's discomfort in sitting for prolonged periods, Consumers proposed that she could bring her laptop into the business center to stand and work at the high-top tables. (ECF No. 46, Ex. 17.) Slater instead propped her laptop up on boxes in her cubicle. (*Id.*)

On June 1, 2012, Plaintiff contacted Human Resources and requested a "remedy" for her PCP, use of a high-low desk in her cubicle, recognition of her medical restrictions, and an end to the harassment. (ECF No. 49, Ex. I.) Lisa Garrett responded on June 4 that Dr. Holda concurred with the recommendation of a high-low desk, so Consumers would provide one. (*Id.*)

On June 11, 2012, Slater presented her progress on the Step II project to a committee for review. (First Amd. Compl. ¶ 117.) On June 14, 2012, Slater was terminated for failure to perform the minimum expectations of her position. (*Id.* ¶ 119.)

## II. Legal Standard

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, "the district court must construe the evidence

and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Nevertheless, the mere existence of a scintilla of evidence in support of a non-movant's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III. Analysis

**A. ADA and PWDCRA Claims**

Slater asserts a cause of action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(5)(A), for Consumers' failure to provide her reasonable accommodations. She also brings a state law claim under the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101 *et seq*. Slater agrees to treating her ADA and PWDCRA together because the PWDCRA substantially mirrors the ADA. (Pet.'s Br. 18, ECF No. 49.) *See Donald v. Sybra*, 667 F.3d 757, 764 (6th Cir. 2012).

To prove a prima facie case of disability discrimination, Slater must show that (1) she is disabled, (2) she is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) she suffered an adverse employment action because of her disability. *Demyanovich v. Cadon Plating & Coatings*, 747 F.3d 419, 433 (6th Cir. 2014). Once Slater establishes a prima facie case of disability discrimination, the burden shifts to Consumers to provide a legitimate, nondiscriminatory reason for terminating her. *Demyanovich,* 747 F.3d at 434.

**1. Was Plaintiff disabled?**

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2); *see also* MCL § 37.1103(d)(i)(A). The ADA regulations construe "substantially limits" broadly to mean that an individual is '[u]nable to perform a major life activity that the average person in the general population can perform; or...[is s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). *See MacDonald v. United Parcel Serv.,* 430 F. App'x. 453, 461-62 (6th Cir. 2011).

Slater claims that she is disabled for purposes of the ADA because she is substantially limited in the major life activity of sitting. The ADA regulations expressly include sitting among the list of major life activities. 29 C.F.R. § 1630.2(i)(1)(I)**.** Several federal courts have recognized that an inability to sit for prolonged periods "*may* be a disability depending on the totality of the circumstances." *Parada v. Banco Indus. De Venez.*, 753 F.3d 62, 60 (2d Cir. 2014); *see also Hayes v. United Parcel Serv*., No. 00-5296, 2001 WL 1006162, at *321 (6th Cir. Aug. 20, 2011) (unpublished opinion); *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 502 (N.D.N.Y. 2004).

In an unpublished decision, the Sixth Circuit determined that the plaintiff submitted sufficient evidence to create a genuine issue of material fact concerning whether he was "disabled" under the ADA because an injury rendered him unable to sit more than 20 or 25 minutes. *Hayes*, 2001 WL 1006162, *321. The plaintiff did not provide proof comparing his restrictions to that of an average person in the general population, but the Court reasoned that "[c]ommon sense and life experiences

will permit finders of fact to determine" whether plaintiff was restricted "compared to the average person." *Id.*

Slater has shown a genuine issue of material fact whether she meets the definition of "substantially limited" so as to be disabled under the ADA and PWDCRA. Slater testifies that she told Dr. Noud, her treating physician, and Dr. Holda, Consumers' IME, that sitting was very difficult because of the surgery incision site. (Slater Dep. 159: 18-22; 162:15-164:15.) Dr. Noud provided restrictions "consisting of . . . sitting for 20 minutes or 2 hours per shift, walking or standing 20 minutes per hour per 8-15 hr shift." (First Amd. Compl. ¶ 109.) Athletic trainer Jim Fast also documented Slater's difficulty sitting for more than 45 minutes at a time. (ECF No. 46, Ex. 16.) Slater has not provided evidence to show that her condition is a significant restriction compared to an average person in the general population, but analysis of whether an impairment substantially limits a major life activity need not be extensive, nor require scientific, medical, or statistical analysis. 29 C.F.R. § 1630.2(j)(iii), (v). Slater has put forth sufficient evidence to raise a genuine issue of material fact concerning whether she was "disabled" for the purposes of the ADA and PWDCRA.

**2. Was Plaintiff qualified to perform the essential functions of her position with or without accommodation?**

To be "otherwise qualified" for her position, Slater must show that she can perform the essential functions of her job, with or without accommodation. 42 U.S.C. § 12111(8). Slater has failed to create a genuine issue of material fact as to her qualifications for her position as Employee Development Consultant.

To survive summary judgment, the plaintiff must "submit sufficient evidence to create a

genuine issue of material fact regarding whether [s]he is qualified for a position with a proposed reasonable accommodation." *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). Slater claims that Consumers failed its duty to reasonably accommodate her disability. She bears the burden of proposing an accommodation as she requires and proving that it is necessary. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010). The employer then bears the burden of showing an accommodation imposes an undue hardship. *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1108 (6th Cir. 2008) (citing *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004)). An employer may initiate an informal, interactive process with the employee to find an appropriate accommodation. 29 C.F.R. § 1630.2(o)(3). Participation is mandatory and must be engaged in in good faith. *Talley*, 542 F.3d at 1110. An employee cannot insist on a specific accommodation if the employer agrees to a reasonable alternative. *Talley,* 542 F.3d at 1108.

      The parties dispute vehemently whether a high-low desk was a required accommodation or a mere suggestion. Slater contends that she participated in an interactive process with the athletic trainer to identify the high-low desk as an appropriate accommodation. She alleges that Consumers engaged in the process in bad faith because it did not obtain the desk nor did it demonstrate that the desk was an undue hardship. (Pet.'s Br. 23-24, ECF No. 49.) For its part, Consumers argues that the athletic trainer merely suggested the desk as one possible accommodation. Consumers provided Slater with reasonable alternatives by respecting her physician's restrictions and permitting her the options to work at high top tables in the business center and to get up and stretch throughout the work day. Regardless of whether the desk was a required accommodation, Consumers was in the process of acquiring it by June 2012, shortly after Slater provided documentation in May from

9

Dr. Noud outlining her possibly permanent disability restrictions.

Slater has nevertheless failed to raise a genuine issue of material fact that she was qualified to perform her position with the high-low desk. "Computer," "[d]evelop training materials," "planning," and "presentation" are among the "required" skills for Slater's position description as an Employee Development Consultant. (ECF No. 46, Ex. 3.) Slater received poor performance reviews in these areas in 2010, prior to the onset of her disability. (ECF No. 46, Ex. 8.) Many of her difficulties arose from her lack of familiarity with computers. In her deposition, Slater repeatedly refers to her lack of knowledge and skill on computers. She "expressed that [she] didn't know how to do the layouts and things, that [she] was having issues with the computer," (*Id.* 176: 14-16) and she asked administrative assistants for help "because they knew how awful [she] was with the computer and they did always try to help [her]." (*Id.* 228:7-8). The entire Step II project required her to use computers extensively to develop PowerPoint presentations, training videos, and manuals. Slater does not articulate how a high-low desk would have assisted her progress in the Step II assignment or helped with her poor computer skills. Therefore, Slater has failed to show the second prong of her prima facie case.

### 3. Was Plaintiff terminated because of her disability?

The bar on discrimination "because of" an employee's disability prohibits discrimination that is a "but-for" cause of the adverse action. *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 321 (6th Cir. 2012).

Slater claims that she would not have been placed on a PCP or fired but for her disability and requested accommodations. She contends that the four days between her complaint to the Consumers' Compliance Department about harassment and the assignment of the PCP suggests a

causal link between her disability and adverse action. (Pet.'s Br. 23, ECF No. 29.) However, Slater was placed on the PCP on April 23 (First Amd. Compl. ¶ 96), several days *prior* to her complaint on April 26. (*Id.*)

In her June 1 letter to Human Resources, Slater stated that she felt "harassed" and her "restrictions/disability [was] not being recognized." She suggested that the a high-low desk would help because she "could stand with this desk and perform [her] duties." (ECF No. 49, Ex. I). However, the factual record does not indicate that Slater could perform her duties, whether or not she had the high-low desk. She has not shown that she would not have been terminated, but for the desk accommodation.

Slater has failed to establish a causal connection between her insistence on an accommodation and her termination. She has belatedly attempted to transform the analysis under this prong into a retaliation claim in her response to Defendants' Motion for Summary Judgment. (Pet.'s Br. 22-24, ECF No. 49.) She claims that Consumers retaliated against her because she insisted on accommodations. This claim is not properly before the Court because she did not timely raise it and provided no legal standard or analysis to support her claim. Furthermore, the claim fails regardless because Slater cannot demonstrate that Defendants' proffered reasons for terminating her were pretextual. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).

**4. Did Defendant provide a legitimate, non-discriminatory reason for terminating Plaintiff?**

Consumers has proffered a legitimate, non-discriminatory reason for terminating her employment. Slater simply failed to make satisfactory progress on the Step II project. Consumers estimated that the entire project entailed 200–400 hours of work, or approximately five to ten weeks

of full time work. (Decl. of Jack Gordier ¶ 4, ECF No. 46, Ex. 3.) As early as 2010, Slater received poor performance reviews for her progress. She was admittedly "rusty" on key subject matter and needed assistance when she provided training. (Slater Dep. 122, ECF No. 49. Ex. A.) She took frequent breaks which interrupted her progress. (ECF No. 46, Ex. 5.) She continued to falter even after Consumers placed her on a Performance Correction Plan to help her identify timelines and goals for the Step II project.

Slater herself admits to her deficiencies using computers and her inability to build the PowerPoint presentations that were core to the Step II modules. (Slater Dep. 227-28, ECF No. 49, Ex. A.) Consumers provided Slater with ample resources to assist her. When Slater expressed that she did not know what to do on the project, Consumers provided her with a dedicated coach, Jason Humphrey, to walk her through intermediate steps. (Slater Dep. 118: 4-10.) Slater also admits that she received computer help from administrative assistants. (Slater Dep. 228.)

Slater contends that Consumers' proffered reason is mere pretext because she was terminated before her PCP ended, and the PCP established unreasonable timelines for the Step II project. However, Slater had not finished the project over the seventeen months she was in the position (excluding her leave for surgeries), despite the fact that Consumers eventually removed all of Slater's other responsibilities so that she could focus on the Step II project. (*See* First Amd. Compl. ¶ 66.) She did not complete the ten week project over the four months after her return to work in January 2012. Slater has failed to rebut Consumers' stated reason for her termination.

Slater has failed to create a genuine issue of material fact on two prongs of her prima facie case of discrimination. Moreover, she has failed to create a genuine issue of material fact that Consumer's proffered reason for her termination was pretext. Therefore, her claims under the ADA

and PWDCRA cannot survive summary judgment.

**B. FMLA Claims**

Slater brings two claims under the Family and Medical Leave Act ("FMLA"), which entitles eligible employees to 12 weeks of leave in any 12-month period "[b]ecause of any serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The requesting employee must provide certification issued by her health care provider stating "(1) the date on which the serious health condition commenced; (2) the probably duration of the condition; (3) the appropriate medical facts within the knowledge of the health provider regarding the condition; . . . [and (4)(B)] a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b). If the employer has cause to doubt the certification, the employer may require a second opinion at its cost. 29 U.S.C. § 2613(c).

An employee who takes leave is entitled to return to her former position, or an equivalent position. 29 U.S.C. § 2914(a)(1). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). Nor may an employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2).

Slater's claims of interference and retaliation under FMLA have absolutely no factual basis. Slater failed to proffer sufficient facts to demonstrate that she did not receive twelve full weeks of leave before returning to work in October or November 2010. In fact, by her own account, she received 112 days of leave in 2010 for her first surgery and recuperation, for a total of 16 weeks. (First Amd. Compl., ¶ 21.) She received over five months of leave (April 20, 2011 to October 2011)

for her second surgery and recuperation, for which she received FMLA leave for this absence. (*Id.*, ¶¶ 45-46). She cannot identify an instance when her employer stated it would not give her FMLA leave, and she was returned to her former position. (Slater Dep. 158: 6–7, 255:25–256:4, ECF No. 29, Ex. A.) At the hearing on Defendants' Motion for Summary Judgment, counsel for Plaintiff conceded that the FMLA claims lack any merit.

### IV. Conclusion

Plaintiff Karen Slater has failed to establish a genuine issue of material fact as to her claim that Defendants discriminated against her in violation of the ADA or PWDCRA. Moreover, she has failed to show that Consumer's stated reason for terminating her was pretext. Plaintiff also concedes that her claims that Defendants violated the FMLA are without merit. For the reasons stated above, the Court will grant Defendant's motion for summary judgment.

The Court will issue an Order consistent with this Opinion.


Date:   October 7, 2014                             /s/ Robert Holmes Bell
                                                    ROBERT HOLMES BELL
                                                    UNITED STATES DISTRICT JUDGE